IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

STATE OF ARIZONA,
*Respondent,*

*v.*

GREGORY NIDEZ VALENCIA JR.,
*Petitioner.*

STATE OF ARIZONA,
*Respondent,*

*v.*

JOEY LEE HEALER,
*Petitioner.*

No. CR-16-0156-PR
Filed December 23, 2016

Appeal from the Superior Court in Pima County
The Honorable James E. Marner, Judge
The Honorable Catherine M. Woods, Judge
Nos. CR048232 and CR051447
**REVERSED AND REMANDED**

Opinion of the Court of Appeals, Division Two
239 Ariz. 255, 370 P.3d 124 (App. 2016)
**VACATED**

COUNSEL:

Barbara LaWall, Pima County Attorney, Jacob R. Lines (argued), Deputy
County Attorney, Tucson, Attorneys for State of Arizona

Dean Brault, Pima County Legal Defender, Alex Heveri (argued), Assistant
Legal Defender, Tucson, Attorneys for Gregory Nidez Valencia Jr.

Steven R. Sonenberg, Pima County Public Defender, David J. Euchner
(argued), Deputy Public Defender, Tucson, Attorneys for Joey Lee Healer

Mark Brnovich, Arizona Attorney General, John R. Lopez IV, Solicitor General, Joseph T. Maziarz, Chief Counsel, Criminal Appeals Section, David A. Simpson, Assistant Attorney General, Phoenix, Attorneys for Amicus Curiae Arizona Attorney General

Mikel Steinfeld, Maricopa County Public Defender's Office, Phoenix, and Katherine Puzauskas, The Arizona Justice Project, Tempe, Attorneys for Amicus Curiae Arizona Attorneys for Criminal Justice

Keith Hilzendeger, Office of the Federal Public Defender, Phoenix, Thomas Phalen, Phoenix, Molly Brizgys, Tempe, Sarah Stone, Law Office of Sarah Stone, Phoenix, Attorneys for Amici Curiae Tonatihu Aguilar, Travis Wade Amaral, Jonathan Andrew Arias, Freddy Crespin, Scott Lee DeShaw, Eulandas J. Flowers, Michael Paul Jessup, Bobby Charles Purcell, Cedric Joseph Rue, Jr., Richard Rojas, and Bobby Jerry Tatum

———————

CHIEF JUSTICE BALES authored the opinion of the Court, in which VICE CHIEF JUSTICE PELANDER and JUSTICES BRUTINEL, TIMMER, and BOLICK joined. JUSTICE BOLICK, joined by VICE CHIEF JUSTICE PELANDER, filed a concurring opinion.

———————

CHIEF JUSTICE BALES, opinion of the Court:

¶1        We here consider whether the trial court erred by summarily denying petitions for post-conviction relief alleging that petitioners' natural life sentences for homicides committed as juveniles are unconstitutional in light of *Miller v. Alabama*, 132 S. Ct. 2455 (2012). Because the United States Supreme Court held in *Montgomery v. Louisiana*, 136 S. Ct. 718 (2016), that *Miller* applies retroactively and "sentencing a child to life without parole is excessive for all but 'the rare juvenile offender whose crime reflects irreparable corruption,'" *id.* at 734 (quoting *Miller*, 132 S. Ct. at 2469), we reverse the trial court's rulings and remand for further proceedings to determine if petitioners are entitled to relief.

## I.

¶2        Joey Lee Healer, when sixteen years old in 1994, borrowed a sawed-off rifle intending to use it to obtain money and a vehicle. He went to the home of seventy-four-year-old Chester Iserman, who had

occasionally hired Healer to do odd jobs and trusted him with free access to his home. Healer fatally shot Iserman and took his truck.

¶3          Gregory Nidez Valencia Jr., when seventeen years old in 1995, along with a sixteen-year-old accomplice, stole a bicycle from an enclosed patio in a condominium complex. When they attempted to enter the patio of another condominium, they were confronted by its owner, Fred George. After a brief exchange, Valencia fatally shot George.

¶4          Healer and Valencia were each convicted of first degree murder. At sentencing, the trial court in each case considered various aggravating and mitigating factors, including the defendant's age. In 1995, Healer was sentenced to natural life imprisonment under A.R.S. § 13-703 (Supp. 1995), meaning he is not eligible for release; Valencia received the same sentence in 1996. After the United States Supreme Court's 2012 decision in *Miller*, they each petitioned for post-conviction relief under Arizona Rule of Criminal Procedure 32.1(g), contending that *Miller* was a "significant change in the law that if determined to apply . . . would probably overturn" their sentences. They also argued that, in light of *Miller*, the Arizona sentencing scheme in place when they were sentenced was unconstitutional.

¶5          The trial court summarily denied relief in each case. With regard to Healer, the trial court concluded that the sentencing court had complied with *Miller* because it had considered Healer's age as a mitigating factor before imposing a natural life sentence. The trial court also observed that any constitutional infirmity in Arizona's sentencing scheme had been resolved by 2014 statutory amendments that reinstated parole for juvenile offenders who received life sentences with the opportunity of release. *See* A.R.S. §§ 13-716, 41-1604.09; 2014 Ariz. Sess. Laws, ch. 156, §§ 2, 3; *see also State v. Vera*, 235 Ariz. 571, 576 ¶ 18, 334 P.3d 754, 759 (App. 2014).

¶6          In Valencia's case, the trial court concluded that the natural life sentence did not violate *Miller* because that sentence was not mandatory, but instead was imposed after the sentencing court had considered Valencia's age and other mitigating factors. The trial court, as in Healer's case, also ruled that the 2014 amendments remedied any constitutional infirmity in the previous sentencing scheme.

¶7        Healer and Valencia filed petitions for review with the court of appeals, which consolidated the cases, accepted review, and granted relief. *State v. Valencia*, 239 Ariz. 255, 256 ¶ 1, 257 ¶ 7, 370 P.3d 124, 125, 126 (App. 2016). The court of appeals ruled that *Miller*, as broadened by *Montgomery*, is a significant change in the law for purposes of Rule 32.1(g) that entitles Healer and Valencia to be resentenced. *Id.* at 258 ¶¶ 12, 15–16, 370 P.3d at 127. In light of this ruling, the court of appeals declined to address their arguments that the sentencing scheme in place when they were sentenced was unconstitutional. *Id.* at 259 ¶ 17 n.3, 370 P.3d at 128.

¶8        We granted review to consider whether *Miller* is a significant change in the law that may require the resentencing of persons serving natural life sentences for crimes committed as juveniles, a legal issue of statewide importance. We have jurisdiction under article 6, section 5(3) of the Arizona Constitution and A.R.S. § 12-120.24.

## II.

¶9        A defendant is entitled to post-conviction relief when "[t]here has been a significant change in the law that if determined to apply to defendant's case would probably overturn the defendant's conviction or sentence[.]" Ariz. R. Crim. P. 32.1(g). A "significant change in the law" is "a clear break from the past." *State v. Shrum*, 220 Ariz. 115, 118 ¶ 15, 203 P.3d 1175, 1178 (2009). Thus, to determine if *Miller* constitutes such a change, we must consider both that decision and the law that existed when Healer and Valencia were sentenced more than a decade earlier.

¶10        When Healer and Valencia were sentenced, A.R.S. § 13-703 provided two sentencing options for juveniles convicted of first-degree murder: (1) natural life; and (2) life without eligibility for release "until the completion of the service of twenty-five calendar years if the victim was fifteen or more years of age and thirty-five if the victim was under fifteen years of age." § 13-703(A) (Supp. 1995). The statute also required a hearing to determine the existence of any aggravating and mitigating circumstances. § 13-703(A)–(H). Among the five mitigating circumstances the sentencing court had to consider was "the defendant's age." § 13-703(G)(5). Here, the sentencing court considered the ages of Healer and Valencia before imposing natural life sentences.

**¶11** The natural life sentences at issue thus were not mandatory but did amount to sentences of life without the possibility of parole. This is because in 1993 Arizona eliminated parole for all offenders, including juveniles, who committed offenses after January 1, 1994, and replaced it with a system of "earned release credits," which can reduce the time that must be served in prison. *See* 1993 Ariz. Sess. Laws, ch. 255, § 86; *see also* A.R.S. § 41-1604.09(I). The system of earned release credits, however, did not by its terms apply to natural life sentences. *See Vera*, 235 Ariz. at 575–76 ¶ 17, 334 P.3d at 758–59.

**¶12** In *Miller*, the Supreme Court ruled that the Eighth Amendment prohibits the imposition of mandatory life-without-parole sentences for juveniles. 132 S. Ct. at 2469. The Court observed that "youth matters in determining the appropriateness of a lifetime of incarceration without the possibility of parole," *id.* at 2465, and that mandatory life-without-parole sentences impermissibly "preclude a sentencer from taking account of an offender's age and the wealth of characteristics and circumstances attendant to it." *Id.* at 2467. The Court further noted that "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon," *id.* at 2469, suggesting that such sentences can only be imposed on the "rare juvenile offender whose crime reflects irreparable corruption" as distinct from "transient immaturity." *Id.* (quoting *Roper v. Simmons*, 543 U.S. 551, 573 (2005)).

**¶13** *Miller* did not expressly resolve whether its holding was procedural - that is, whether it barred only mandatory sentences of life-without-parole for juveniles - or instead substantive in restricting the class of juveniles eligible for "this harshest possible penalty." *Id.* The decision also did not resolve whether it was retroactive. In the aftermath of *Miller*, courts reached conflicting decisions on these issues. *Compare, e.g.*, *People v. Davis*, 6 N.E.3d 709, 722 (Ill. 2014) (holding that *Miller* announced a new substantive rule that applies retroactively), *with, e.g.*, *State v. Tate*, 130 So. 3d 829, 841 (La. 2013) (holding that *Miller* announced a new procedural rule that does not apply retroactively).

**¶14** *Montgomery* resolved this conflict by clarifying that *Miller* is a new substantive rule of constitutional law that must be given retroactive effect by state courts. 136 S. Ct. at 729, 732. *Miller*, as interpreted by the majority in *Montgomery*, did not adopt merely a procedural rule requiring individualized sentencing (as distinct from mandatory sentences of life

without parole), but instead recognized that "sentencing a child to life without parole is excessive for all but 'the rare juvenile offender whose crime reflects irreparable corruption.'" *Id.* at 734 (quoting *Miller*, 132 S. Ct. at 2469). *Miller* reflects a "substantive holding that life without parole is an excessive sentence for children whose crimes reflect transient immaturity." *Id.* at 735. This conclusion prompted a vigorous dissent, which argued that the majority had effectively rewritten *Miller* to require states to eliminate life-without-parole sentences for juveniles. *Id.* at 737, 743–44 (Scalia, J., joined by Thomas & Alito, JJ., dissenting).

¶15 *Miller*, as clarified by *Montgomery*, represents a "clear break from the past" for purposes of Rule 32.1(g). Arizona law, when Healer and Valencia were sentenced, allowed a trial court to impose a natural life sentence on a juvenile convicted of first degree murder without distinguishing crimes that reflected "irreparable corruption" rather than the "transient immaturity of youth." Because *Miller* reflects a new substantive rule of constitutional law, we are required by *Montgomery* to give this rule retroactive effect.

¶16 Notwithstanding *Montgomery*, the State argues that *Miller* does not constitute a significant change in the law for purposes of Rule 32.1(g). The State contends that *Miller* bars mandatory sentences of life without parole and thus requires only that the sentencing court consider the juvenile's age as a mitigating factor before imposing a natural life sentence - as occurred in each case here. *Montgomery* refutes these arguments by expressly holding that *Miller* reflects a substantive rule and noting "[e]ven if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects unfortunate yet transient immaturity." *Id.* at 734 (internal quotation marks omitted); *see also Tatum v. Arizona*, 137 S. Ct. 11, 12 (2016) (summarily granting review, vacating, and remanding for reconsideration, in light of *Montgomery*, several decisions by the Arizona Court of Appeals rejecting claims for post-conviction relief under *Miller* where sentencing court had considered the petitioner's youth).

¶17 In order to be entitled to resentencing, Healer and Valencia must also establish that *Miller* "if determined to apply . . . would probably overturn" their sentences. Ariz. R. Crim. P. 32.1(g). But the retroactivity of *Miller* and the failure of the sentencing courts to expressly determine whether the juvenile defendants' crimes reflected "irreparable corruption"

do not in themselves entitle Valencia and Healer to post-conviction relief. *Montgomery* noted that "*Miller* did not require trial courts to make a finding of fact regarding a child's incorrigibility," but instead held that imposing a sentence of life without parole on "a child whose crime reflects transient immaturity" violates the Eighth Amendment. 136 S. Ct. at 136.

¶18        Healer and Valencia are entitled to evidentiary hearings on their Rule 32.1(g) petitions because they have made colorable claims for relief based on *Miller*. *See* Ariz. R. Crim. P. 32.8(a) ("The defendant shall be entitled to a hearing to determine issues of material fact[.]"); *State v. Amaral*, 239 Ariz. 217, 220 ¶¶ 11–12, 368 P.3d 925, 928 (2016) (discussing when an evidentiary hearing is required). At these hearings, they will have an opportunity to establish, by a preponderance of the evidence, that their crimes did not reflect irreparable corruption but instead transient immaturity. *See* Ariz. R. Crim. P. 32.8(c). Only if they meet this burden will they establish that their natural life sentences are unconstitutional, thus entitling them to resentencing. *Cf. Montgomery*, 136 S. Ct. at 736–37 (noting "prisoners like Montgomery must be given the opportunity to show their crime did not reflect irreparable corruption; and, if it did not, their hope for some years of life outside prison walls must be restored"). If the State does not contest that the crime reflected transient immaturity, it should stipulate to the defendant's resentencing in light of *Montgomery* and *Miller*.

¶19        The need for such evidentiary and resentencing hearings could be obviated, as *Montgomery* recognized, "by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them." *Id.* at 736. While this result could be achieved by the legislature amending A.R.S. § 13-716 to apply to inmates serving natural life sentences for murders committed as juveniles, it is not a change that can be mandated by judicial decision.

## III.

¶20        We vacate the opinion of the court of appeals, reverse the trial court's rulings dismissing the petitions for post-conviction relief, and remand the cases to the trial court for further proceedings to determine if petitioners are entitled to relief.

JUSTICE BOLICK, with whom VICE CHIEF JUSTICE PELANDER joins, concurring.

¶21          I join fully the Court's opinion, which is compelled by the United States Supreme Court's decisions in *Miller* and *Montgomery*. I write to further explain the context in which we address these issues and to express serious concerns over the direction in which the Supreme Court appears to be headed.

¶22          The murders in these cases were brutal. In 1994, sixteen-year-old Joey Lee Healer borrowed a sawed-off rifle and entered the home of Chester Iserman, an elderly man who had given Healer odd jobs so he could earn money. Healer shot Iserman through the eye, killing him, and then stole his truck. In 1995, seventeen-year-old Gregory Valencia and a younger accomplice entered a condominium complex, took a bicycle from an enclosed patio, and tried to enter another unit's patio. When the homeowner, Fred George, heard his patio gate rattling, he came out to confront the thieves. Valencia's accomplice threw the stolen bicycle at George and Valencia shot him in the head, killing him. Healer and Valencia were both convicted of first-degree murder. Even after considering mitigating evidence including the juveniles' ages, the court sentenced each defendant to natural life in prison.

¶23          Though *Miller* implied that our state's laws mandate life without possibility of parole in circumstances like those presented here, 132 S. Ct. at 2473 n.13, Arizona currently requires (and did so when these sentences were issued) trial courts to consider age as a mitigating factor in determining punishment for first-degree murder. *See* A.R.S. § 13-701(E)(1). Indeed, courts must consider not only a juvenile's age but also the "level of maturity, judgment and involvement in the crime." *State v. Greenway*, 170 Ariz. 155, 170, 823 P.2d 22, 37 (1991). The state does not mandate life sentences without parole for such offenses. *See* A.R.S. § 13-752(A). However, because Arizona abolished parole for all crimes committed after January 1, 1994, *see* 1993 Ariz. Sess. Laws, ch. 255, § 86; *see also* A.R.S. § 41-1604.09(I), an individual sentenced to life in prison for a minimum number of years is unlikely to be released.[1]   And, of course, convicted juvenile

---

[1] Following *Miller*, the legislature provided that juveniles sentenced to life for a minimum number of years will be eligible for parole once the minimum sentence is served. A.R.S. § 13-716.

murderers like Healer and Valencia who received natural life sentences have no possibility for parole.

¶24        In *Roper*, 543 U.S. at 568, the Court held that imposition of the death penalty on persons who committed murder when under age eighteen violates the Eighth Amendment's prohibition against cruel and unusual punishment.   The Court differentiated between juvenile and adult offenders on three grounds:  (1) underdeveloped maturity and sense of responsibility among young people may lead to reckless behavior; (2) juveniles are more susceptible to outside pressures and negative influences; and (3) youth character is less firmly developed.  *Id.* at 569–70.  Those considerations led the Court to conclude that "the death penalty is disproportionate punishment for offenders under 18."  *Id.* at 575.

¶25        Seven years later in *Miller*, the Court extended that reasoning to mandatory life sentences without possibility of parole, stating that "[b]y making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment."  132 S. Ct. at 2469.  Rather than categorically prohibiting such sentences, however, the Court held that sentencers must "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison."  *Id.*

¶26        In *Montgomery*, the Court was posed with a single question: did *Miller* announce a new substantive rule, which has retroactive effect, or a procedural one, which generally does not?  136 S. Ct. at 726; *see also Teague v. Lane*, 489 U.S. 288, 311 (1989) (applying retroactively "watershed rules of criminal procedure").  Searching in vain to find such a substantive rule in *Miller*, the Court instead created one in *Montgomery*, reasoning that the unannounced rule that courts must make a finding of "irreparable corruption" before sentencing a juvenile offender to life imprisonment without parole, *id.* at 735, was implicit in the earlier case.  "That *Miller* did not impose a formal factfinding requirement does not leave the States free to sentence a child whose crime reflects transient immaturity to life without parole."  *Id.*  By retroactively grafting a substantive rule upon its prior ruling, the Court in turn rendered *Miller*, as modified, retroactive as well. As a result, Arizona, like many other states, must now reconsider sentences imposed in some instances many decades ago, in a largely unguided effort to determine today whether people long behind bars were "irreparabl[y] corrupt[ed]" when they committed the murders underlying their

convictions. *See Roper*, 543 U.S. at 573 (noting the difficulty of differentiating between transient immaturity and irreparable corruption).

**¶27** I agree with concerns expressed by the *Miller* and *Montgomery* dissenters. First, the Court has effectively amended the Eighth Amendment to prohibit cruel *or* unusual punishment, rather than cruel *and* unusual punishment, which is how the text reads. *See Miller*, 132 S. Ct. at 2487–90 (Alito, J., dissenting) (stating that the "Court long ago abandoned the original meaning of the Eighth Amendment"). Second, the *Montgomery* Court's suggestion that states can avoid re-litigating old sentences "by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them," 136 S. Ct. at 736, amounts to none-too-subtle coercion. *See id.* at 744 (Scalia, J., dissenting) ("And then, in Godfather fashion, the majority makes state legislatures an offer they can't refuse: Avoid all the utterly impossible nonsense we have prescribed by simply 'permitting juvenile homicide offenders to be considered for parole.'").

**¶28** But even more troubling from a practical standpoint is the Court's sweeping pronouncement that the "vast majority" of juvenile offenders must be shielded from lifetime confinement. *Id.* at 734. By announcing in advance that most murders committed by juveniles "reflect the transient immaturity of youth," the Court trivializes the killers' actions and culpability. "Transient immaturity" is when my adolescent daughter slugs her big brother. It may even describe peer pressures that influence reckless behavior. But it is not an apt rationalization for cold-blooded murder.

**¶29** In *Miller*, the Court remarked that "we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." 132 S. Ct. at 2469. This "gratuitous prediction," Chief Justice Roberts responded, "appears to be . . . an invitation to overturn life without parole sentences," without explicitly "declaring that the Eighth Amendment prohibits them." *Id.* at 2481 (Roberts, C.J., dissenting). By *Montgomery*, "uncommon" evolved into "vast majority," with the Court attributing to *Miller* a "conclusion" it never reached: "that the sentence of life without parole is disproportionate for the vast majority of juvenile offenders." *Montgomery*, 136 S. Ct. at 736.

**¶30** We should treat the Court's forecast that irreparable corruption will not be found in the "vast majority" of cases as speculative

and dictum. By being convicted of first-degree murder, juvenile offenders already have been proven "uncommon" and outside of the "vast majority" of young people who manage to avoid committing such heinous crimes. Certainly the victims' plight is no different whether the murderer is seventeen or seventy. Of course, a life sentence is far more consequential for the former than the latter. Appropriately, Arizona's laws for decades have required the mitigating considerations of age, maturity, and responsibility—and now, the possibility of parole for those juveniles who were convicted of first-degree murder but not sentenced to natural life. *See* A.R.S. § 13-716; *Vera*, 235 Ariz. at 576 ¶ 18, 334 P.3d at 759. We are assured that the Court does "not foreclose" life sentences without parole, *Miller*, 132 S. Ct. at 2469, as long as the court determines the crime does not reflect transient immaturity. *Montgomery*, 136 S. Ct. at 734. Within this nebulous construct, sentencers should apply their best judgment, assessing all relevant factors. Our system's integrity and constitutionality depend not on whether the overall number of sentences of life without parole meted out to youthful murderers are many or few. They depend primarily on whether justice is rendered in individual cases. *Cf. McClesky v. Kemp*, 481 U.S. 279, 294–95 (1987) (rejecting statistics-based challenge to the death penalty).

**¶31**       The United States Supreme Court observes that a switch to parole eligibility for juvenile murderers in all instances—a result it advocates and portends but does not yet expressly mandate—will make the possibility of release available for those "who demonstrate the truth of *Miller*'s central intuition—that children who commit even heinous crimes are capable of change." *Montgomery*, 136 S. Ct. at 736. Such intuition is laudable, but it is no substitute for the rule of law, or for the justice it seeks to secure not only for wrongdoers but for those impacted by the most grievous of crimes.

11